UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRIAN J. WILLIAMS,              )
                               )
            Plaintiff,          )
                               )
        vs.                     )        No. 4:07-CV-1649 (CEJ)
                               )
MICHAEL J. ASTRUE,              )
Commissioner of Social          )
Security,                       )
            Defendant.          )

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

## I.    **Procedural History**

On October 12, 2005, plaintiff Brian J. Williams filed
applications for childhood insurance benefits under Title II of the
Social Security Act, 42 U.S.C. §§ 401 *et seq*., based upon the
earnings record of his father, Jay Travis Williams, the deceased
insured wage earner (Tr. 52-54), with an alleged onset date of
January 1, 1995.[1] Plaintiff claimed disability based on juvenile
diabetes and mental retardation.   (Tr. 11, 114).   After his
applications were denied on initial consideration (Tr. 39-43, 157-
62), plaintiff requested a hearing from an Administrative Law Judge
(ALJ).  (Tr. 6).

---

[1] On January 21, 2005, plaintiff filed applications for
childhood insurance benefits, and for supplemental security income
benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq*. (Tr.
163-65), which were denied on April 4, 2005.  (Tr. 10).   The
Administrative Law Judge (ALJ) only addressed plaintiff's claim for
childhood insurance benefits.  (Tr. 10).   The ALJ found that the
doctrine of *res judicata* applied to the period ending with the
prior determination.

The hearing was held on August 3, 2006. Plaintiff was represented by counsel. (Tr. 195-215). The ALJ issued a decision on January 17, 2007, denying plaintiff's claims. (Tr. 7-20). The Appeals Council denied plaintiff's request for review on July 20, 2007. (Tr. 2). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. **Evidence before the ALJ**

### A. **Testimony at the Hearing**

Plaintiff was the sole witness at the hearing on August 3, 2006. (Tr. 195). At the time of the hearing, plaintiff was 22 years old.[2] (Tr. 20). Plaintiff testified that he had never attended college or vocational school. (Tr. 196). Plaintiff received on-the-job training while employed by Steak 'N Shake, Inc. (Tr. 196). Plaintiff had never been self-employed. (Tr. 197). In August of 2005, he filed for unemployment benefits after his employer, Jack in the Box, Inc., fired him. (Tr. 197-98). Plaintiff testified that, as an adult, he had been arrested three or four times. (Tr. 198). Plaintiff had never received a DUI or DWI, nor participated in rehabilitation for alcohol or drug abuse. (Tr. 198). Plaintiff testified that he had never received medication, therapy or counseling, nor been hospitalized for psychiatric problems. (Tr. 210).

As to his physical impairments, plaintiff suffered from diabetes and had received insulin shots since age 13. (Tr. 199).

_____

[2]Plaintiff was born on January 28, 1984. (Tr. 11).

Plaintiff testified that he followed a special diet, which consisted of "[s]ugar-free stuff [and] diet sodas . . . ." (Tr. 200). Plaintiff checked his blood sugar three times a day. He paid for his doctor visits "out of his pocket" because he had no insurance. (Tr. 200). Plaintiff testified that he visited Dr. Athmaram Shetty at the Southwest Medical Center, but he could not recall the names of his previous doctors. (Tr. 200-1).

In response to the ALJ's question as to how he would explain diabetes to others, plaintiff testified that "[i]t makes [him] feel where [he does not] remember what's going on sometimes, and it keeps [him] from working . . . ." (Tr. 201). Plaintiff's blood sugar readings would fluctuate. (Tr. 201). Plaintiff experienced dizziness and sometimes vomiting when his blood sugar was low. (Tr. 201). In addition, plaintiff sometimes experienced diabetic reactions. (Tr. 203). Although no doctor had instructed him to do so, plaintiff preferred to eat a snack every ten minutes to "keep [his] sugar good." (Tr. 204). Plaintiff testified that, during the hearing, he ate snacks every thirty minutes. (Tr. 204).

Plaintiff took insulin shots "in the morning, in the evening and at lunch or at dinner[,]" which his mother helped administer. (Tr. 204). Plaintiff testified that he always remembered to take his medication. (Tr. 204). Plaintiff then testified that sometimes he forgot to take his medication and to eat lunch or snacks. (Tr. 204-5). Plaintiff's snacks consisted of sugar-free candy and crackers. (Tr. 205). Plaintiff testified that he

frequently became thirsty and made frequent visits to the bathroom.
(Tr. 205).

As to his mental impairments, plaintiff testified that he was
diagnosed with a low IQ in kindergarten. Plaintiff then testified
that he could not recall when he was diagnosed because he has
"trouble remembering things." (Tr. 206). The ALJ instructed
plaintiff's attorney to "refer to a specific report . . . instead
of relying on [plaintiff's] testimony[.]" (Tr. 207). Plaintiff's
attorney stated that plaintiff's Individualized Education Program
(IEP) indicated when his IQ was tested. (Tr. 207). Plaintiff's
attorney noted that the IEP contained "IQ scores from November 14th
of 1996, when [plaintiff] was twelve years and nine months old[;]
his Verbal IQ was 73, his performance IQ was 68, and his Full Scale
IQ was 68 . . . ." (Tr. 207).

Given plaintiff's IQ scores, the ALJ questioned his ability to
obtain a driver's license. Specifically, the ALJ asked plaintiff's
attorney if a doctor, psychiatrist, or psychologist could explain
how a person with plaintiff's IQ could pass the driver's license
test. (Tr. 207). Plaintiff's attorney stated that the Job Corps
program helped plaintiff prepare for the test and that he took the
test several times before he passed. (Tr. 208). Job Corps also
provided plaintiff with school training. (Tr. 208). Plaintiff
testified that he drove himself to and from work. (Tr. 208). The
ALJ noted that the Office of the Inspector General (OIG) report
indicated that plaintiff had a car registered in his name. (Tr.
208). The ALJ also noted that plaintiff's school records indicated

-4-

that his intellectual capacity was "at a borderline range of Cognitive Functioning . . . [and that he was] not mentally retarded." (Tr. 208). Plaintiff testified that he never claimed to be mentally retarded and that he thought it was best for him to place the car in his name. (Tr. 208-9). The ALJ noted that the OIG report indicated that plaintiff's "[m]other [had] been cited for attempting to fraudulently get [b]enefits for" him. (Tr. 209). The ALJ then stated that "there is some question as to the credibility of the information the Mother [was] providing." (Tr. 209).

As to his employment history, plaintiff testified that he worked three to four hours a day at Steak 'N Shake. (Tr. 209). Plaintiff worked six to seven hours per day when he worked at Jack in the Box. (Tr. 209). Plaintiff's attorney confirmed that, during the second quarter of 2004, plaintiff had worked for Culinaire International, Inc. (Culinaire). (Tr. 209-10). Because plaintiff could not recall his duties while working at Culinaire, the ALJ instructed plaintiff's attorney to provide plaintiff's specific duties while working at the Culinaire and Steak 'N Shake, along with the number of hours that he worked per day.[3] (Tr. 210, 214). Plaintiff testified that, in 2005, he worked for Work Force, Inc. (Tr. 209).

Plaintiff testified that he lived with his mother, aunt and brother, where he had his own bedroom. (Tr. 210-11). When asked

_____

[3] The ALJ left the record open for thirty days. (Tr. 214).

by the ALJ to describe his typical day for him, plaintiff testified that, when he was not working, he watched television and sat on the couch, while he ate snacks and meals. (Tr. 211). When plaintiff and his mother were both off work, they went shopping. (Tr. 211). Plaintiff's mother prepared his breakfast and lunch when he was at home, and either his mother or girlfriend prepared his dinner. (Tr. 211). As to household chores, plaintiff testified did not help his mother with vacuuming, sweeping, mopping, or washing the dishes. (Tr. 212). Plaintiff, however, cleaned his bedroom and sometimes emptied the trash. (Tr. 212).

Plaintiff and his 22-year-old girlfriend had been in a relationship for three or four years. (Tr. 211). Plaintiff testified that they saw each other "about four times a week." (Tr. 211). Plaintiff testified that they went "to the movies, . . . to her house to hang out . . . and watch TV and stuff like that." (Tr. 211). When they went to the movies, plaintiff's girlfriend drove. (Tr. 211).

Plaintiff testified that he did not have friends "because they seem[ed] to get [him] in trouble." (Tr. 212). Apart from spending time with his girlfriend, plaintiff had no other hobbies or interests. (Tr. 212). When the ALJ commented that the OIG report included a police report indicating that plaintiff was in a vehicle with at least three other females on one occasion, plaintiff testified that the incident occurred when he was 18 years old. (Tr. 214). Plaintiff testified that he did not have friends "because [he] would make the wrong friends." (Tr. 214). Plaintiff

did not read books, and that he watched television sitcoms.  (Tr. 213).

Although he could sit through an entire movie, plaintiff testified that he could only sit for an hour and a half to two hours before he had to stand up.  (Tr. 213).  Plaintiff was unsure of how long he could stand before he had to sit down.  (Tr. 213-14).  Plaintiff could walk one to two miles and lift forty pounds. (Tr. 214).

**B.  School Records**

On November 14, 1996, plaintiff underwent WISC-III[4] testing at Fox Junior High School, which produced a verbal IQ score of 73, performance IQ score of 68, and a full scale IQ score of 68.  (Tr. 127; Suppl. Tr. 289, 291).  At the time of the testing, plaintiff was 12 years old.  (Suppl. Tr. 289).  The Interpretative Report of the WISC testing indicated that plaintiff's "general cognitive ability [was] within the intellectual deficient range of intellectual functioning . . . ."  (Suppl. Tr. 289).

On April 26, 2000, Seckman Senior High School developed an IEP for plaintiff.  (Suppl. Tr. 240).  The IEP indicated that plaintiff functioned with borderline cognitive ability, but his vision, speech, and language skills were adequate.  (Suppl. Tr. 245).  The IEP later stated that plaintiff suffered from mental retardation.

---

[4]WISC is the abbreviation for Wechsler Intelligence Scale for Children, which is an intelligence test for children between the ages of 6 and 16.  Wechsler Intelligence Scale for Children, http://en.wikipedia.org/wiki/Wechsler_Intelligence_Scale_for_Children (last visited Jan. 16, 2009).

(Suppl. Tr. 244).  The IEP also reported that plaintiff's strengths included reading, comprehension, and math.  (Suppl. Tr. 245).  The IEP also indicated that plaintiff was diabetic, received daily insulin injections at home, and sometimes required snack and water breaks at school.  (Suppl. Tr. 245).  The IEP revealed that plaintiff's most recent grade report included A's in math and English and C's in science and social studies.  (Suppl. Tr. 245).

On May 3, 2002, Fox Senior High School completed an IEP for plaintiff, which indicated that he suffered from mental retardation, and thus qualified for special educational and transitional services.  (Suppl. Tr. 215, 222).  The IEP also indicated that plaintiff (1) met the criteria for admission to a post-secondary institution; (2) knew how to open and maintain a checking and savings account; (3) could utilize public utility companies, the post office, and the driver's license bureau, etc.; (4) demonstrated use of different modes of transportation; (5) expressed opinions and needs effectively; and (6) exhibited social skills.  (Suppl. Tr. 232-33).  IEP also reported that plaintiff (1) did not demonstrate the skills, aptitude and behavior to reach his employment goals; (2) needed help finding a job; (3) would need assistance from an adult agency in his pursuit of a post-secondary education; (4) could not effectively express his limitations and need for various support services; (5) needed ongoing assistance with maintaining his finances and income; (6) could not select a realistic and affordable living environment; and (7) did not demonstrate knowledge of the skills necessary for various living

arrangements and lifestyles. (Suppl. Tr. 232-34). Plaintiff's school records dated May 3, 2002 also indicated that plaintiff was "a 18.3 year old . . . 11th grader with cognitive functioning in the borderline range of Mental Retardation." (Suppl. Tr. 217). Plaintiff's Fox High School records revealed that he dropped out of school in the eleventh grade. (Suppl. Tr. 237).

## C.   Medical Records

The record includes an undated letter from Brian Bergfeld, M.D., in which he wrote that:

> Brian Williams has type one diabetes, which is juvenile diabetes.  He therefore requires daily insulin to avoid hospitalization and death.  I have known Brian for 6 months and have seen dramatic improvement in his disease control with the current regiment of insulin.  It is very important that he receives these medications as prescribed and he maintains regular follow up visits with me.

(Tr. 134).

On December 7, 2004, Dr. Bergfeld examined plaintiff at the Southwest Medical Center. (Tr. 135-36). Plaintiff informed Dr. Bergfeld that his morning blood sugar levels were 60-80. (Tr. 135). Dr. Bergfeld noted that plaintiff's regime included both Lantus and Novolin insulins. (Tr. 12, 135). Dr. Bergfeld's report indicated that plaintiff had normal constitutional, respiratory, and musculoskeletal systems. (Tr. 135). Dr. Bergeld reported that plaintiff's diabetes was under good control and that he needed a refill of Novolin. (Tr. 135).

In a report dated June 29, 2005, plaintiff's primary care physician, Athmaram Shetty, M.D., stated that plaintiff suffered

from blurred vision, general malaise, retinopathy, extreme pain/numbness, and dizziness/loss of balance. (Tr. 123). Dr. Shetty reported that plaintiff "experience[d] pain, fatigue, or other symptoms severe enough to interfere with attention and concentration needed to perform competitive days' work . . . most of the time." (Tr. 123). As to plaintiff's lifting limitations, Dr. Shetty noted that plaintiff could repetitively and occasionally lift less than ten pounds, and frequently lifted ten pounds. (Tr. 123). Dr. Shetty further reported that plaintiff could stand or walk for at least two hours in an eight-hour workday and sit for less than six hours in an eight-hour work day. (Tr. 124).

The record indicates that, on February 1, 2007, plaintiff's blood sugar level was high. (Tr. 185). On February 16, 2005, April, 5, 2005, and February 1, 2007, plaintiff underwent Hemoglobin A1c testing.[5] (Tr. 146-47, 185). Each test indicated that plaintiff's blood sugar levels were elevated. (Tr. 146-47, 185).

### D. Psychological Evaluation

After filing his application for benefits, the Cape Girardeau Disability Office referred plaintiff to Joseph Monolo, a licensed psychologist, for a psychological evaluation. (Tr. 125). On March 15, 2005, Mr. Monolo examined plaintiff. (Tr. 125). Plaintiff

---

[5] Hemoglobin A1c testing "gives you a picture of your average blood glucose control for the past 2 to 3 months. The results give you a good idea of how well your diabetes treatment plan is working." See http://www.diabetes.org/type-1-diabetes/a1c-test.jsp (last visited Jan. 5, 2009).

informed Mr. Monolo that "he left school in the 10th or 11th grade because he was failing." (Tr. 125). Plaintiff and his mother stated that plaintiff "ha[d] poor reading and math skills, [could not] read the newspaper or correspondence received in the mail or most directions or instructions on packages." (Tr. 125). Mr. Monolo wrote:

> [Plaintiff's] concentration and persistence were adequate during testing; however, he would have difficulty maintaining these and managing work-related stress and pressure if given jobs beyond his level of ability . . . . His reported limited success in the workplace is seemingly a reflection of his overall cognition as he was unable to remember job and task demands and could not follow through without continual structure. [Plaintiff]'s mood at times could be affected by fluctuating blood sugar levels but he also appears to be experiencing some depressive reactions to his limitations and current situation, a factor which may require psychiatric consultation if [the] mood problems persist and escalate or begin to interfere with his functioning.

(Tr. 127-28). In the "Test Observations" section of his report, Mr. Monolo noted that:

> [Plaintiff] was soft-spoken and brief in his replies and usually did not elaborate responses or provide information without direct questioning. He was knowledgeable about his history. He displayed a flat affect and sat almost motionless during his visit. He was attentive and, overall, provided adequate effort, but at times needed encouragement to persist on some items."

(Tr. 126).

During Mr. Monolo's evaluation, plaintiff underwent an intelligence test. (Tr. 126). Plaintiff obtained a verbal IQ score of 66, performance IQ score of 64, and a full-scale IQ score of 62. (Tr. 126). Based on the test results and his observations, Mr. Monolo indicated that plaintiff was "a young man whose

cognitive functioning [was] within the mild range of mental retardation in both the verbal and psychomotor areas. . . . [Plaintiff]'s presentation during [the] evaluation was consistent with [the] test results as he exhibited a flat affect, [and he] was brief in his replies and limited in his verbal expressive abilities." (Tr. 127). Mr. Monolo also reported that plaintiff suffered from an adjustment disorder with a depressed mood, diabetes, and vision impairments. (Tr. 128).

### III. **The ALJ's Decision**

Administrative Law Judge Jhane Pappenfus presided at plaintiff's administrative hearing, and made the following findings:

1.  The claimant alleged that he became unable to work on January 1, 1995. He is the unmarried child of the deceased wage earner and was dependent on the wage earner. The claimant was born on January 28, 1984 and the period during which he must establish disability for Childhood Insurance Benefits (disability) purposes extended through January 2006.

2.  The claimant has not engaged in substantial gainful activity since September 2004.

3.  The medical evidence establishes that the claimant has diabetes mellitus, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P Regulations No. 4.

4.  The claimant's allegations of disabling symptoms precluding all substantial gainful activity are not consistent with the evidence and are not credible for the reasons specified in the body of the decision.

5.  The claimant has the residual functional capacity to perform work except for work that involves lifting over fifty pounds. Giving some credibility to the claimant's allegations of cognitive deficits, the

claimant is limited to unskilled work, as
contemplated by the Medical-Vocational Rules.
Despite the claimant's cognitive deficits, he is
able to understand, remember and carry out simple
instructions, make simple work-related decisions and
respond appropriately to supervision, co-workers and
ususal work situations. There are no other
exertional or nonexertional limitations (20 C.F.R.
§ 404.1545).

6. The claimant is not able to perform his past
relevant work.

7. The claimant has the residual functional capacity to
perform a full range of medium work (20 C.F.R. §
404.1567).

8. The claimant is 22 years old, which is defined as a
younger individual (20 C.F.R. § 404.1563).

9. The claimant has completed 10 years of education (20
C.F.R. § 404.1564).

10. Considering the claimant's residual functional
capacity and vocational factors, the issue of
whether the claimant has transferrable skills in not
critical (20 C.F.R. § 404.1568).

11. Based on the framework of Rule 203.25, Table No.3 of
Appendix 2, Subpart P, Regulations No. 4 and
considering the claimant's residual functional
capacity, age, education, and work experience, he is
not disabled.

12. The claimant is not under a disability, as defined
in the Social Security Act and Regulations (20
C.F.R. § 404.1520(g)). The claimant was not
disabled on or prior to his attainment of age 22.

(Tr. 18-19).

## IV. Discussion

To be eligible for childhood insurance benefits based upon the

earnings record of a deceased insured person, plaintiff must prove

that he (1) is the insured person's child; (2) was dependent on the

insured person; (3)is unmarried; and (4) became disabled prior to

age 22.  42 U.S.C. § 402(d); 20 C.F.R. § 404.350.  The only dispute is whether plaintiff became disabled prior to age 22.

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings."  <u>Nimick v. Secretary of Health and Human Serv.</u> 887 F.2d 864 (8th Cir. 1989).  The ALJ first determines whether the claimant is engaged in substantial gainful activity.  If the claimant is so engaged, he is not disabled.  Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.  Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act.  Fourth, the ALJ determines whether the claimant can perform his past relevant work.  If the claimant can, he is not disabled.  Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy.  If the claimant is not, he is disabled.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (2002); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).


**A. <u>Standard of Review</u>**

The Court must affirm the Commissioner's decision, if the decision "is supported by substantial evidence on the record as a whole." Gladden v. Callahan, 139 F.3d 1219, 1222 (8th Cir. 1998), quoting Smith v. Schweiker, 728 F.2d 1158, 1161 (8th Cir. 1984). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). To determine whether the Commissioner's decision is supported by substantial evidence, the Court "must take into account whatever in the record detracts from its weight." Gladden, 139 F.3d at 1222, quoting Smith v. Schweiker, 728 F.2d at 1162. The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.    The ALJ's credibility findings;

2.    the plaintiff's vocational factors;

3.    the medical evidence;

4.    the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.    third-party corroboration of the plaintiff's impairments; and

6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See <u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. <u>Pearsall</u>, 274 F.3d at 1217, <u>citing</u> <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000).

### B. **Plaintiff's Allegations of Error**

Plaintiff's administrative appeal raises two allegations of error by the ALJ: (1) finding that plaintiff's impairments did not meet the requirements of Listing 12.05(C); and (2) conducting an improper analysis of plaintiff's credibility.

The ALJ determined that, "[b]ased on [plaintiff]'s mental impairments, [he had] no limitations in activities of daily living, mild limitations in concentration, persistence, or pace, no limitations in social functioning, and . . . had no episodes of decompensation in work or work-like settings." (Tr. 17). The ALJ, therefore, concluded that plaintiff's mental health impairments did not meet, or equal, Listing 12.05(C), 20 C.F.R. 404, App. 1 to Subpt. P, (entitled "Mental Retardation"). "[T]o meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of

function." Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). The ALJ concluded that plaintiff did not demonstrate limitations such that he satisfied the requirements of Listing 12.05(C).

The ALJ determined that the record contained no valid verbal, performance, or full scale IQ of 60 through 70 for plaintiff. The ALJ, however, failed to address plaintiff's IQ scores from 1996. The record reveals that, in 1996, intelligence testing indicated that plaintiff obtained IQ scores of 73 for verbal, 68 for performance, and 68 for full scale. (Suppl. Tr. 289). At the time of testing, plaintiff was 12 years old. As such, plaintiff's mental retardation would be examined pursuant to Listing 112 for Part B of 20 C.F.R. Pt. 404, App. 1 to Subpt. P, which only applies to impairments of children under age 18. Section 112(D)(10) provides, in relevant part, that "IQ test results must . . . be sufficiently current for accurate assessment under 112.05. . . . IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above." 20 C.F.R. Pt. 404, App. 1 to Subpt. P, § 112 (emphasis added). However, 20 C.F.R. § 416.924 states that, if a claimant is 18 years old when he files his disability benefits application, "[f]or the period during which [he was] under age 18, . . . the disability rules . . . for adults" will apply. 20 C.F.R. § 416.924(f). Therefore, Part A of 20 C.F.R. Pt. 404, App. 1 to Subpt. P applies to plaintiff's 1996 IQ scores, which includes Listing 12.05(C) because he was 21 years old when filed his application for childhood benefits. (Tr. 52).

Because Listing 12.05(C) contains no currency requirement, and the ALJ asserted no argument questioning the validity of plaintiff's 1996 IQ scores, the IQ scores of 68 for performance and 68 for full scale are valid.

Although the ALJ did not mention plaintiff's 1996 IQ scores, the ALJ acknowledged and rejected his IQ scores obtained from the intelligence test on March 15, 2005. (Tr. 13, 125-26). The ALJ noted that the 2005 intelligence test reported that plaintiff "obtained scores of 66 for verbal IQ, 64 for performance IQ, and 62 for full scale IQ." (Tr. 13). The ALJ, however, discredited these scores because "Mr. Monolo needed to encourage [the] persistence of [plaintiff] during testing[, and] especially in light of the evidence suggesting symptom magnification." (Tr. 14). Even assuming that plaintiff's 2005 IQ scores are invalid, as discussed above, the record contains substantial evidence that plaintiff satisfied the first prong of Listing 12.05(C) because the 1996 IQ test reported that he obtained a valid score of 68 for both performance and full scale.

To satisfy the second requirement of Listing 12.05(C), the claimant must show an onset of mental retardation before age 22. Listing 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." C.F.R. Pt. 404, App. 1 to Subpt. P, § 12.05. The record indicates that plaintiff "was retained in kindergarten and was referred for an evaluation during his second year of kindergarten.

-18-

He was diagnosed [as] Mentally Retarded and Speech/Language Disordered in 1990 and [started receiving special education] services [at] that time." (Suppl. Tr. 275). Although the ALJ states that plaintiff's "school records . . . do not show evidence of [plaintiff's] disabling problems with adaptive functioning as a result of any cognitive deficits of the claimant, the record in fact reveals that, at age 12, he exhibited deficits in adaptive functioning when he became "involved in numerous incidents with various students and [was] many times the instigator of conflicts between other students and himself." (Suppl. Tr. 278); see Maresh, 438 F.3d 897, 900 (The plaintiff "exhibited deficits in adaptive functioning at a young age, when he had frequent fights with other children."). The record also indicates that, at age 16, "[plaintiff]'s behavior in class [was considered] uncooperative at times[, and that he did] not get along well with [his peers] and [had] been suspended for fighting at times." (Suppl. Tr. 245). Moreover, plaintiff's school records indicate that he was diagnosed as mildly mentally retarded, and that his "cognitive ability [fell] in the mentally deficient range of intelligence (FSIQ-68)." (Suppl. Tr. 265, 277). Furthermore, as discussed above, at the age 12, plaintiff obtained an IQ score of 68 for performance and full scale. Based on the foregoing, the record contains substantial evidence that plaintiff's mental retardation manifested before age 22.

"The third requirement of Listing 12.05C is that the claimant has a physical or other mental impairment imposing an additional

and significant work-related limitation of function, i.e., a 'more than slight or minimal' effect on the ability to perform work." Maresh, 438 F.3d 897, 900, citing Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000). The ALJ determined that plaintiff suffered from diabetes mellitus. Although the ALJ concluded that plaintiff's impairment was severe "since it [was] more than a slight abnormality having more than a minimal effect on [his] ability to work." (Tr. 11). The ALJ, however, determined "that it [did] not meet or equal in duration or severity the criteria established under the appropriate listings . . . ." (Tr. 11, 18). The ALJ found that plaintiff "has the residual capacity to perform a full range of medium." (Tr. 18)(internal citation omitted). In her findings, the ALJ concluded that plaintiff was not able to perform his past relevant work. (Tr. 18).

The Eighth Circuit, in Cook v. Bowen, 797 F.2d 687 (8th Cir. 1986), held that a claimant has a physical or other mental impairment imposing an additional and significant work-related limitation of function "when the . . . physical or additional mental impairment . . . has 'more than slight or minimal' effect on his ability to perform work." Sird v. Chater, 105 F.3d 401, 403 (8th Cir. 1997). The Eighth Circuit also mentioned the Fourth Circuit's holding that "if a claimant cannot perform his past relevant work, he 'experiences a significant work related limitation of function' and meets the [third requirement] of § 12.05(C)." 105 F.3d at 403-4 (citing Branham v. Heckler, 775 F.2d 1271, 1273 (4th Cir. 1985)). The Eighth Circuit rejected the

Commissioner's assertion that "the Fourth Circuit ruling establishes a per se [sic] rule and that a better practice would be to interpret § 12.05(C) under the Eighth Circuit's 'more slight or minimal' test." <u>Sird</u>, 105 F.3d at 403. Under either test, the Eighth Circuit held that the claimant satisfied the third requirement and was entitled to benefits. <u>Id</u>. at 404. Likewise, in the instant case, the record indicates that the third requirement is satisfied under either test. First, the ALJ's finding that plaintiff's diabetes was severe "since it is more than a slight abnormality having more than a minimal effect on [his] ability to work" satisfies the <u>Cook v. Bowen</u> test. (Tr. 11). Second, the ALJ's finding that plaintiff is unable to perform his past relevant work satisfies the Fourth Circuit's *per se* rule as well. Therefore, the ALJ's finding itself establishes that plaintiff satisfied the third requirement of Listing 12.05(C).

Because the record contains substantial evidence that plaintiff satisfied the three requirements of Listing 12.05(C), the Court will not address the ALJ's analysis of plaintiff's credibility.

## V. <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole. The decision, therefore, will be reversed and remanded under sentence 4 of 42 U.S.C. § 405(g). Upon remand the Commissioner should award disability benefits based upon a period of disability beginning January 1, 1995.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [Doc. #24] is **granted.**

**IT IS FURTHER ORDERED** that, pursuant to sentence 4 of 42 U.S.C. § 405(g), the decision of the Administrative Law Judge is reversed and remanded to the Commissioner for an award of childhood insurance benefits based upon a period of disability beginning January 1, 1995.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 28th day of January, 2009.